JOURNAL ENTRY and OPINION
Defendant-appellant Lloyd Maynard appeals from his convictions and sentences after a jury trial on eleven counts of aggravated arson, one count of arson, one count of disrupting public services, and one count of intimidation.
In his assignments of error, appellant presents several arguments: (1) his conviction for intimidation was based upon insufficient evidence; (2) all of his convictions were against the manifest weight of the evidence; (3) the trial court erred in imposing sentence in that it failed to consider several convictions were allied offenses and failed to make the requisite findings for the record; and (4) he was denied his right to the effective assistance of counsel at trial.
This court has carefully considered the record in light of appellant's arguments. Although appellant's convictions are supported in the record, the trial court committed error in imposing sentence upon appellant. Therefore, appellant's convictions are affirmed, but appellant's sentences are vacated and this case is remanded for re-sentencing in accordance with statutory requirements
Appellant's convictions stem from an incident that occurred in the early morning hours of Wednesday, April 1, 1998. Beginning at approximately 12:30 a.m., a fire destroyed the industrial building located at West 65th Street and Clark Avenue in the City of Cleveland. The building was known as "the former P.O.C. Brewery."[1]
At the time of the incident, the GMS Management corporation owned the property upon which the building stood. GMS rented a portion of both the property and the building's space to Andrew Kiss. Kiss used the property for a "car lot" and the building for storage. Without permission of GMS, Kiss stored unused automotive tires inside the building. Also without permission of GMS, Kiss rented a portion of the building's space to appellant.
Appellant used his portion of the building's space for an automobile refinishing business. Since the enterprise was clandestine in nature, appellant generally worked at night and concealed indications of his presence at other times. Appellant had several younger men who helped him in conducting his business, viz., his nephew Ricky Maynard, Ricky's two cousins Michael Steven Taylor and Robert Osborne, and Ricky's friend Seid Ibrahim.
In February 1998, Cleveland Fire Department inspectors visited the building and noted numerous violations of the city fire code. GMS subsequently informed Kiss he would have to remove the hundreds of automotive tires stored in the building. Kiss agreed to do so; however, his compliance was equivocal.
At approximately this same time, appellant ceased making regular payments of rent to Kiss and the relationship between the two men became strained. During this time, some valuable items of equipment appellant had hidden in his space disappeared. Since "the door was kicked in from the inside," appellant surmised Kiss had appropriated the items to offset appellant's outstanding rental payments. Kiss also requested termination of the electrical service to the building, forcing appellant to find another place to conduct his business enterprise. Appellant responded to these events with the statement to his nephew that they would "just move out slowly and then get even with [Kiss] later."
Ricky realized what appellant meant by this statement during the process of helping appellant move his business. Sometime in the middle of March 1998, he heard appellant direct Ibrahim to "set [a] fire in the back [of the building] to the garbage." Since the resulting trash fire, however, soon was extinguished, appellant indicated "it wasn't really good enough for what Andy [Kiss] did to him." Appellant suggested to Ricky that if the "building caught on fire," Kiss "wouldn't have nothing" and also "would get in trouble for having tires" inside it. Thereafter, appellant completed the transfer of his business to a new location at West 32nd Street and Clark Avenue.
In late March 1998, appellant's customer Eric Amodei overheard appellant state to Ricky and Ibrahim that Kiss's "building was going down."
On the evening of Tuesday, March 31, 1998 Osborne, Ibrahim and Taylor were at Maynard's house, located at West 53rd and Train Avenue, "working in the garage." At approximately 11:30 p.m., appellant arrived. Appellant drove his truck into the vacant lot next to the garage, and the young men walked over to converse with him.
In the ensuing discussion, appellant presented the subject of a "big fire" at the old brewery. The men debated who would be actively involved. Appellant promised Ibrahim "extra paint" work so that Ibrahim would have money "to make [his] car look good." Appellant also volunteered to paint Osborne's vehicle. Eventually, the group separated.
Ricky and Taylor drove Taylor's automobile to Taylor's house. Taylor lived with his aunt at 3288 West 67th Street near the brewery building. Appellant, with Osborne and Ibrahim in his truck, drove to a local gasoline station, purchased a gallon of gasoline, dispensed some of it into a plastic milk jug, and handed one of the young men some money to take to the station's cashier.
Appellant, Osborne and Ibrahim then proceeded to the rear parking area of a sandwich shop on West 65th Street near Clark Avenue.
At that point, appellant delivered some keys to Ibrahim and "asked [him] if [he] had anything to light with." When Ibrahim responded, "No," appellant furnished his disposable cigarette lighter. Appellant instructed the two young men to "go in, pour the gas, take a rock or something, [and] wrap it up with paper" After lighting the paper with the cigarette lighter, appellant instructed them to "throw the paper toward the tire[s] and run."
Osborne and Ibrahim exited the truck, walked on a short pathway, crossed the railway tracks and approached the brewery building from the south. Appellant's keys apparently enabled them to enter both the gates surrounding the property and the brewery building itself.
Once inside, the two men "walked all of the way [to] the back, where * * * tires had been stacked up." Ibrahim poured the gasoline from the plastic container "all in one spot." The two also found some "lantern fluid," which they used to make "a little trail away" from the area to a hallway. From his position in the hallway, Ibrahim bent over to apply the lighter to the trail of fluid. As the two men turned to leave, the fuel exploded behind them. Their hair and clothes singed, they "both took off running."
Osborne and Ibrahim fled the building. They followed the railway tracks for a short distance, crossed, and ran to Taylor's house, where their comrades were waiting.
Upon their arrival, as Taylor and Ricky hurried the two into the house, Osborne shouted that "[Ibrahim] almost killed me." Taylor and Ricky applied wet towels to them and helped them wash. Appellant observed that Ibrahim "should have listened to [him]" but, clearly, Ibrahim had failed to follow instructions when lighting the gasoline. As they prepared to leave Taylor's house, appellant suggested Ibrahim leave the area for a time, then invited him to stay at appellant's Aurora residence.
Shortly after midnight on April 1, 1998, Cleveland firefighters responded to a call of "smoke in the area" of West 65th Street and Clark Avenue. The fire was in the old brewery building. It already had grown "quite large" by the time of the arrival of the first firefighting unit; the fire eventually was classified as a "triple-three alarm."
The firefighters who arrived in the first unit, among them Derryl Harris, Captain Timothy Misch, and Donald Henry, had difficulty in approaching the fire due to several factors: (1) secured gates surrounded the building; (2) the property was located near a railroad and a railroad trestle; (3) the building was distant from a source of water; (4) a large quantity of foul-smelling smoke came from it; and (5) high-voltage tension wires passed overhead on poles that already also were burning. Moreover, Misch could hear a rear portion of the building collapsing. Additionally, in view of the age of the structure, the building's height and architecture, and the fuel load inside, the fire was especially dangerous.
Nevertheless, several men entered the western portion of the building, including Michael Borovich, Amil Rivera, Matthew Hollenbeck, James Sliter, Patrick Mangan and Patrick Moner. However, after they had advanced approximately "60 to 70 feet" inside, Captain William Deighton ordered them out when he observed a "rollover of the flame[s] coming over on top" of his men.
Ultimately, between "80 and 100" firefighters were involved in the effort to extinguish the brewery. Railway service ceased for a time while the fire units used the tracks as a parking area. The fire department's resources also were highly taxed since a major fire occurred that same night at a pubic utility "transfer station" in another location. Much of the building was destroyed; GMS later estimated the loss in the value of its property at $54,800.00.
Fire investigators soon discovered the deliberate nature of the fire. Moreover, from a "passerby," investigators obtained a description of one of the suspects that enabled the creation of an artist's sketch. The sketch of the suspect, a young male with the street name of "Faheid," was distributed to local law enforcement agencies. The suspect was believed to be "staying with a party by the name of Maynard."
On April 8, 1998, while on routine patrol, Solon Police Patrolman Rick Tonelli noticed a vehicle with a "punched" lock on the driver's side door traveling westbound on Aurora Road. Tonelli used his radio to request information on the vehicle's license plate. He was notified the vehicle was registered to appellant but that the plate's "sticker" had expired. Since Tonelli had observed a current "sticker" on the plate, he decided to stop the vehicle.
Upon requesting appellant's driver's license, Tonelli could see inside the vehicle. The young man sitting in the rear seat bore a strong resemblance to the artist's sketch of the arson suspect.
Eventually, appellant, Ibrahim, Osborne, Ricky and Taylor all were arrested in connection with the fire at the brewery. Each gave conflicting statements, which tended to either deny or minimize his part in the incident. Appellant suggested that the police consider Kiss a suspect.
On May 7, 1998 appellant was indicted with Ibrahim, Osborne and his nephew Ricky Maynard[2] on the following charges: (1) eleven counts of aggravated arson, R.C. 2909.02[3]; (2) one count of arson, R.C. 2909.03;(3) one count of disrupting public service, R.C. 2909.04; and (4) one count of breaking and entering, R.C.2911.13. Appellant also was indicted individually on two counts of intimidation, R.C. 2921.04.
Appellant pleaded not guilty to the charges and retained counsel to represent him. Prior to trial, each of appellant's co-defendants entered into plea agreements with the state; a part of each agreement required these men to testify as state's witnesses at appellant's trial.[4]
Appellant's case proceeded to a jury trial on September 21, 1998. The state presented the testimony of numerous witnesses, including appellant's co-defendants, the Cleveland Fire Department Chief, Cleveland fire investigators, a representative of GMS Management, appellant's sister-in-law, and Ruby Taylor, grandmother of Taylor, Osborne and Ricky Maynard. The state also introduced into evidence photographs taken of the scene during and after the blaze. Following the trial court's dismissal of one of the counts of intimidation, appellant elected to present no evidence.
The jury ultimately returned a verdict of guilty on each of the remaining charges. The trial court ordered a presentence investigation and report, then sentenced appellant to concurrent terms of incarceration as follows: five years on each count of aggravated arson, and one year each on the count of disrupting public service and on the count of intimidation. The trial court also imposed a term of five years on the count of arson and ordered this term to be served consecutively to the others; thus, appellant was sentenced to a total of ten years of incarceration.
This court granted appellant's motion to file a delayed appeal of his convictions and sentences. Appellant presents five assignments of error for review, which will be addressed in logical order and combined when appropriate.
Appellant's second assignment of error states:
 THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE AS THE STATE FAILED TO SUFFICIENTLY PROVE EACH ELEMENT OF THE CHARGED OFFENSE OF INTIMIDATION BEYOND A REASONABLE DOUBT THUS DENYING THE APPELLANT LLOYD MAYNARD HIS CONSTITUTIONAL RIGHT TO DUE PROCESS.
 A. THE STATE FAILED TO OFFER SUFFICIENT EVIDENCE TO ESTABLISH THAT A "WITNESS" WAS INTIMIDATED, THREATENED, OR HINDERED IN THE DISCHARGE OF HER DUTY BY ANY ACTIONS OF APPELLANT LLOYD MAYNARD AND THEREFORE FAILED TO PROVE A NECESSARY ELEMENT OF THE CHARGED OFFENSE OF INTIMIDATION PURSUANT TO R.C. 2921.04.
 B. THE STATE FAILED TO OFFER ANY EVIDENCE PROVING THAT APPELLANT POSSESSED THE MEANS REA REQUIRED TO ESTABLISH THE OFFENSE OF INTIMIDATION OF A WITNESS IN VIOLATION OF R.C. 2921.04, AND THUS THE EVIDENCE WAS INSUFFICIENT TO WARRANT A CONVICTION FOR THIS ALLEGED VIOLATION.
Appellant argues he was denied his right to due process of law when he was convicted of intimidation. Appellant contends the state proved neither that the alleged victim, Ruby Taylor, was a "witness," as that term is defined in R.C. 2921.04, nor that appellant could have been aware of her potential status as a witness when he spoke to her. Appellant thus asserts the trial court erred in denying his motion for acquittal as to this charge. This court disagrees.
A motion for acquittal should be denied if the evidence is such that reasonable minds could reach different conclusions as to whether each material element of the crime has been proven beyond a reasonable doubt. State v. Dennis (1997), 79 Ohio St.3d 421;State v. Jenks (1991), 61 Ohio St.3d 259; State v. Bridgeman
(1978), 55 Ohio St.2d 261. The trial court is required to view the evidence in a light most favorable to the state. State v.Martin (1983), 20 Ohio App.3d 172.
R.C. 2921.04 states in pertinent part:
 § 2921.04 Intimidation of attorney, victim or witness in criminal case.
* * *
 (B) No person, knowingly and by force or by unlawful threat off harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties off the attorney or witness.
(Emphasis added.)
At trial, the state called Ruby Taylor to testify. Taylor stated she was the grandmother of three of appellant's co-defendants and that appellant was the brother-in-law of one of her daughters. Thus, she was well acquainted with all four men.
Taylor testified that one afternoon soon after the fire at the brewery building, she visited the nearby K-Mart store with one of her daughters. Taylor waited in the vehicle in the parking lot with a two-year-old grandson while her daughter shopped.
During that time, appellant, Ricky Maynard and Ibrahim, arrived at the store. Noticing Taylor, they approached her vehicle and began a conversation with her. Taylor testified as follows:
Q. * * * Who brought up the subject about the fire?
 A. If I remember right, Ricky told me that he was out of jail, and he felt real good.
And I said, "Yes, you stay out of jail. You stay out of trouble.
He said, "Well, I am not in no trouble, I don't think."
 And I just — you know, they got on the subject about, you know about the fire. They said that.
I said, "I just don't know. It is a bad one."
 I said, "I don't know who set it." But I said, "Whoever did was bad."
And then Lloyd told me that, he said, "Yes."
 He said, "Anybody who accused me of that, you know, down the road, if I go to prison, when I get out, I will mess them up and burn them out."
* * *
Q. Who was Lloyd saying that to?
 A. Me, I guess. I was the only one in the car, and my grandson, and he is two or three years old.
* * *
Q. Okay. Why would he be saying this to anyone?
A. In case he got out of jail, when he got out, I would burn.
Q. Now, why would that upset you?
 A. Because he might be afraid that I am wise on him, and he would come to me, which I wasn't.
 Q. Okay. Now, you have known him as an individual for at least 15 years?
A. Yes.
* * *
 Q. But based upon what you knew, what he said to you, that upset you?
A. Yes, it did, yes.
Q. Because you took what he said seriously?
A. Yes, I did.
* * *
 Q. How did you interpret the comment by [appellant] to you about him getting out of jail and burning somebody's house down?
 A. Well, I took it to be me. It was a threat to me. That is the way that I took it.
* * *
Q. And, to your knowledge, you knew Ricky had been arrested?
A. Right.
 Q. Did you know whether or not Lloyd had been arrested in connection with the fire?
A. No, I did not.
(Emphasis added.)
For purposes of statutes such as R.C. 2921.04 (B), the word "witness" has been defined as a person who has factual knowledge relevant to the issues involved in a proceeding. See, e.g., Statev. Lieberman (1961), 114 Ohio App. 339; State v. Hudson (June 30, 1982), Summit App. No. 10491, unreported. The word also has been more broadly defined to include one who is "cognizant of something by direct experience." State v. Crider (1984), 21 Ohio App.3d 268
. Moreover, since this statute was designed to protect people who either see, hear, know or even may know material facts concerning a criminal activity that could become the subject of a criminal prosecution, those persons whom the defendant is aware may testify against him are within its ambit. Id.
Ruby Taylor's testimony demonstrates she was concerned that her grandson Ricky had been arrested in connection with the fire. Moreover, she obviously knew Ricky Maynard's personality, as well as the personalities of her other two grandsons. She also knew appellant, and Ricky, at that time, was in his company. Her single comment that "whoever" was responsible for the arson was "bad" immediately caused appellant to warn that "anybody" who implicated him would place themselves at risk.
Viewed in a light most favorable to the prosecution, this evidence demonstrated both Ruby Taylor's status as a potential witness in any future criminal prosecution of appellant and appellant's awareness of that possibility. State v. Lieberman,supra; State v. Alexander (Nov. 23, 1994), Cuyahoga App. No. 66430, unreported; State v. Kaszas (Sep. 10, 1998), Cuyahoga App. Nos. 72546, 72547, unreported; State v. Jordan (Nov. 25, 1998), Cuyahoga App. No. 73364, unreported. Ruby Taylor was not required to be a witness either to the arson, itself, or to the plan to commit it; it was sufficient that she had knowledge of the character of many of the suspects and that appellant was aware of her knowledge.
Therefore, the trial court did not err in overruling appellant's motion for acquittal on the intimidation charge. Appellant's second assignment of error, accordingly, is overruled.
Appellant's first assignment of error states:
 APPELLANT'S CONVICTION ON ALL AMENDED COUNTS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant argues that none of his convictions was supported by the weight of the evidence. This court has thoroughly examined the record and finds appellant's argument lacks substance.
In State v. Martin (1983), 20 Ohio App.3d 173 at 175, the court set forth the test to be utilized when addressing the issue of manifest weight of the evidence:
 There being sufficient evidence to support the conviction as a matter of law, we next consider the claim that the judgment was against the manifest weight of the evidence. Here the test is much broader. The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. * * * See Tibbs v. Florida
(1982), 457 U.S. 31, 38, 42.
(Emphasis added.) See, also, State v. Thompkins (1997), 78 Ohio St.3d 380
. Moreover, the weight of the evidence and the credibility of the witnesses are matters primarily to be resolved by the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1; State v. Thompkins, supra.
Appellant contends the testimony of his co-defendants was conflicting and therefore lacked credibility. A review of the record, however, demonstrates the testimony of each co-defendant and each of the other state witnesses was consistent as to the essential facts that established the elements of the offenses.
The inferences to be drawn by the evidence presented are the following: Appellant wanted to "get even" with Kiss both for the missing equipment and for forcing appellant to relocate his business. When a small trash fire near the building failed to send the requisite message, appellant promised two of his young associates he would trade automobile refinishing work for their actions in setting a tire fire in the brewery building. Appellant aided these men in this enterprise by furnishing gasoline, a ride to the location, instructions, and his cigarette lighter.
The resulting blaze placed the lives of at least ten firefighters in jeopardy, suspended rail service in that area until it could be extinguished, destroyed several utility poles, severely damaged the brewery building, and caused GMS Management to sustain at least $54,000 in property losses.
In the days following the blaze, appellant gave Osborne and Ibrahim sanctuary at his home, intimated to the grandmother of three of his co-defendants that he would "burn" anyone who hinted to the authorities he might have had a role in the crime and, furthermore, attempted to interest the authorities, instead, in considering Kiss as the culprit.
Therefore, there was substantial, credible evidence that proved the elements of eleven counts of aggravated arson, one count of arson, one count of disrupting public services, and one count of intimidation. State v. Kaszas, supra; State v. Alexander, supra;State v. DeBoue (Mar. 11, 1993), Cuyahoga App. No. 61954, unreported.
Accordingly, appellant's first assignment of error also is overruled.
Appellant's third assignment of error states:
 THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT IMPROPERLY CONVICTED AND SENTENCED APPELLANT OF SEVERAL ALLIED OFFENSES OF SIMILAR IMPORT STEMMING FROM THE SAME CONDUCT, IN VIOLATION OF R.C. 2941.25.
Appellant argues his convictions and sentences for eleven counts of aggravated arson and one count of arson were improper pursuant to R.C. 2941.25(A).
R.C. 2941.25 states:
§ 2941.25 Multiple counts.
 (A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
In State v. Jordan, supra, this court stated the following as the relevant analysis to be undertaken pursuant to the statute:
 In State v. Blankenship (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, the court set forth a two part test to determine whether two crimes with which a defendant is charged are allied offenses of similar import:
 In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds that either the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses.
 If multiple offenses are not of "similar import," analysis of R.C. 2941.25 stops at subsection (A), and the statute does not bar multiple convictions. When an offense is defined in terms of conduct towards another, then there is a dissimilar import for each person affected by the conduct. State v. Phillips (1991), 75 Ohio App.3d 785, 790, 600 N.E.2d 825, citing State v. Jones
(1985), 18 Ohio St.3d 116, 118, 480 N.E.2d 408.
(Emphasis added.)
The indictment against appellant clearly sets forth a different victim in each of the first ten counts of aggravated arson and the count of arson; moreover, the final count alleged appellant had committed the offense as part of an agreement for hire. Thus, each count of aggravated arson and the count of arson contain a different element.
Since the crimes for which appellant was convicted and sentenced did not meet the requirements of R.C. 2941.25(A), the trial court committed no error in this regard. See, e.g., Statev. Lockhart (Sep. 16, 1999), Cuyahoga App. No. 74113, unreported;State v. Bailey (June 11, 1992), Cuyahoga App. No. 60735, unreported.
Appellant's third assignment of error, therefore, is overruled.
Appellant's fourth assignment of error states:
 THE TRIAL COURT COMMITTED PLAIN AND PREJUDICIAL ERROR IN ITS SENTENCING OF APPELLANT ON OCTOBER 15, 1998.
 A. [THE] TRIAL COURT ERRED IN SENTENCING THE DEFENDANT TO A PRISON TERM OF FIVE (5) YEARS FOR HIS ALLEGED VIOLATION OF 2909.03(A)(1), TO WIT: ARSON, A FELONY OF THE FOURTH DEGREE, WRONGFULLY BELIEVING THAT THE OFFENSE WAS A FELONY OF THE SECOND DEGREE.
 B. THE TRIAL COURT ERRED IN IMPOSING MORE THAN THE MINIMUM AUTHORIZED SENTENCES WITHOUT MAKING THE REQUISITE STATUTORY FINDINGS.
 C. PER ARGUENDO, SHOULD IT BE FOUND PROPER TO HAVE SENTENCED APPELLANT TO JAIL TERMS FOR THE ELEVEN (11) SEPARATE COUNTS OF AGGRAVATED ARSON, AS WELL AS THE ONE (1) COUNT OF ARSON, THE TRIAL COURT ERRED BY
ORDERING THE SENTENCES TO RUN CONSECUTIVELY.
Appellant argues his sentence for the crime of arson was in excess of the statutory maximum for that crime and further argues the trial court failed to make the requisite findings for the record prior to imposing sentence upon him for the remaining offenses. Appellant's arguments in part are persuasive.
A review of the record reveals appellant was indicted on one count of arson in violation of R.C. 2909.03(A)(1), with the value of the property estimated at over $500.00. Pursuant to R.C.2909.03(B)(2)(b), this crime is a felony of the fourth degree.
Fourth degree felonies are punishable by a prison term of six to eighteen months. R.C. 2929.14(A)(4). The trial court, however, imposed a term of five years upon appellant for this offense. Since this sentence clearly is in excess of the statutory limit and the trial court has discretionary power to sentence only in accordance with law, appellant's sentence for the arson conviction must be reversed. R.C. 2953.08(G)(1)(d);State v. Dillon (1883), 30 Ohio St. 586; Cleveland v. Scott
(1983), 8 Ohio App.3d 358.
Appellant further contends the trial court neither adequately explained its reasons for failing to impose the minimum terms of incarceration nor made the required findings prior to ordering the sentence for arson to run consecutively to the sentences for the other offenses.
R.C. 2929.14(B) states:
 [I]f the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender and if the offender previously has not served a prison term, the court shall impose the shortest prison term authorized for the offense pursuant to division (A) of this section unless the court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others.
(Emphasis added.)
In State v. Edmonson (1999), 86 Ohio St.3d 324, the supreme court analyzed the foregoing language and gave the following directive for appellate review:
 The appellate districts in this state currently hold differing opinions about what information a trial court must include in a sentencing hearing record when imposing a sentence that is longer than the minimum upon an offender expected to receive the minimum sentence according to the presumption in R.C. 2929.14(B). The appellate debate in this state centers on the scope of the statutory phrase "finds on the record."
 We construe this statute to mean that unless a court imposes the shortest term authorized on a felony offender who has never served a prison term, the record of the sentencing hearing must reflect that the court found that either or both of the two statutorily sanctioned reasons for exceeding the minimum term warranted the longer sentence.
 R.C. 2929.14(B) does not require that the trial court give its reasons for its finding that the seriousness of the offender's conduct will be demeaned or that the public will not be adequately protected from future crimes before it can lawfully impose more than the minimum authorized sentence. By contrasting this statute with other related sentencing statutes, we deduce that the verb "finds" as used in this statute means that the court must note that it engaged in the analysis and that it varied from the minimum for at least one of the two sanctioned reasons. With other sentencing statutes, the General Assembly explicitly demands that courts give reasons. * * *
 Our deduction is buttressed by other language in the sentencing statutes. The phraseology in R.C. 2953.08(A)(2), for example, supports the view that the statutory purpose is fulfilled when a court notes that it has considered the statutory criteria and specifies which of the given bases warrants its decision to vary from the preferred minimum sentence. * * * The structure of the various sentencing statutes suggests that the General Assembly approached felony sentencing by mandating a record reflecting that judges considered certain factors and presumptions to confirm that the court's decision-making process included all of the statutorily required sentencing considerations.
Id. at 327-327. (Emphasis in original; underscoring added.)
The trial court made the following comments at appellant's sentencing hearing:
 Well, counsel's correct in the statement I heard all the testimony at trial. I listened carefully and have reviewed the presentence report and take into consideration the remarks made today.
 What the Court does find is that the defendant does not have a prior record, this is indeed his first conviction. However, what I have heard here is that this — the jury that we had a few weeks back did find him guilty on all counts that were presented to them (sic)
 This was a very serious crime. Number one, the manipulation by the defendant of the younger individuals involved here, who were frankly not so bright, what was indicated to me that in someway (sic) he incited or encouraged or collaborated or guided them into the criminal activity and they indeed are receiving their just due.
 I found here, also, strong evidence of disregard for the property of others and certainly the health and safety of the community.
Those tires burning and that black smoke hovering over the neighborhood cannot be good for anyone, as well as the fire threatening the neighboring buildings and neighbors. Again, the effect on the transfer station fire, the fact that, perhaps, the — this fire did hamper the ability to successfully fight that fire is another consideration. And the extent of the damages in this case although the building was not in the best of shape. It did have to leveled and there were demolition costs and loss of a building.
 The unfortunate part of this, the lives of not only the families of the younger individuals involved here, but Mr. Maynard's families II,] are ruined as well. They do not have their father and husband there with them.
However, this is serious enough * * *
From the foregoing, it is apparent the trial court "engaged in the analysis and that it varied from the minimum [terms] for at least one of the two sanctioned reasons." State v. Edmonson,supra.
The trial court's decision to impose consecutive terms upon appellant, however, is flawed. The trial court made no further findings; it simply pronounced sentence.
The trial court ordered appellant to serve a term of five years on each of the first tens counts of aggravated arson, five years on the arson count, one year each on the convictions for disrupting public service and intimidation, which are third degree felonies, and five years on the final conviction for aggravated arson. The trial court then stated, "All counts will be served concurrently" but added a proviso, thereafter ordering the term on one of appellant's convictions to be served consecutively.
It is apparent that the trial court intended to impose the consecutive term for appellant's conviction on the count of aggravated arson that alleged "arson for higher (sic)." This was count fifteen after the re-numbering. However, the trial court stated it was "count 21;" thus, the journal entry of appellant's sentence indicates the consecutive term was imposed instead on "count eleven," the count of arson.
Pursuant to R.C. 2929.14(E)(4), the trial court may order consecutive sentences if it finds such "service is necessary to protect the public * * * and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct * * *." The court further must consider three other factors; if any one of those factors is applicable, consecutive sentences are warranted.
From the trial court's comments made during sentencing, it appears the trial court sought to impose consecutive sentences because it found the "harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct." R.C. 2929.14(E)(4)(b).
However, the trial court neither engaged in the first part of the analysis required by R.C. 2929.14(E)(4) nor explained subsections (a) and (c) were inapplicable to this case. Furthermore, the trial court referred to a different count than the one for which the consecutive term was intended to be imposed.
This court, therefore, cannot permit the trial court's order of sentence to stand. R.C. 2953.08(G)(1)(b). Rather, prior to imposing consecutive sentences, the trial court must demonstrate on the record that it considered each of the requirements set forth in R.C. 2929.14(E)(4) and must identify appropriately the conviction to which the sentence applies. State v. Hawkins (Aug. 19, 1999), Cuyahoga App. No. 74678, unreported; State v. Lockhart,supra; State v. Lesher (July 29, 1999), Cuyahoga App. No. 74469, unreported.
Since the sentence imposed upon appellant for the crime of arson was in excess of the statutory limits, and the portion of the trial court order imposing consecutive sentences is flawed, appellant's fourth assignment of error is sustained.
Appellant's fifth assignment of error states:
 APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING TRIAL AND AT IMPOSITION OF SENTENCE.
 A. AT TRIAL, COUNSEL NEGLECTED TO CALL SEVERAL WITNESSES WHOSE TESTIMONY WOULD HAVE CLEARLY ESTABLISHED AN ALIBI FOR THE APPELLANT AT THE TIME OF THE ALLEGED CRIMINAL ACTIVITY.
 B. TRIAL COUNSEL FAILED TO OBJECT TO APPELLANT'S MULTIPLE CONVICTIONS FOR ALLIED OFFENSES OF SIMILAR IMPORT.
 C. TRIAL COUNSEL FAILED TO OBJECT TO APPELLANT'S SENTENCE FOR ARSON, WHICH WAS CONTRARY TO THAT WHICH IS AUTHORIZED BY STATUTE.
 D. TRIAL COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S IMPOSITION OF MORE THAN THE MINIMUM AUTHORIZED SENTENCES FOR THE ALLEGED OFFENSES WITHOUT ESTABLISHING THE REQUISITE STATUTORY FINDINGS.
 E. TRIAL COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S IMPOSITION OF CONSECUTIVE SENTENCES UPON APPELLANT FOR HIS CONVICTION FOR ARSON AND ALL OTHER CONVICTIONS, WHICH WERE TO RUN CONCURRENTLY, WITHOUT MAKING THE EXPRESS FINDINGS MANDATED BY STATUTE.
Appellant cites five examples that he asserts demonstrate retained trial counsel was constitutionally deficient in his representation of appellant.
The federal test for determining whether a defendant was denied effective assistance is whether the attorney's "conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."Strickland v. Washington (1984), 466 U.S. 668. The focus in Ohio is whether a defendant received a fair trial and substantial justice was done. State v. Hester (1976), 45 Ohio St.2d 71, syllabus 4.
To establish a claim of ineffective assistance of counsel, therefore, a defendant must demonstrate that his attorney's performance was deficient and that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." State v. Bradley (1989),42 Ohio St.3d 136. See, also, State v. Evans (1992), 63 Ohio St.3d 231; State v. Lytle (1976), 48 Ohio St.2d 391, vacated on other grounds (1978), 436 U.S. 910. There is a strong presumption defense counsel performed competently. Vaughn v. Maxwell (1965).2 Ohio St.2d 299. Thus, appellant cannot meet his burden by making mere allegations that find no support in the record. State v.Smith (1985), 17 Ohio St.3d 98. Moreover, this court will not second-guess what could be considered to be matters of trial strategy. Id.
Appellant first asserts trial counsel failed to prepare a proper defense since he called no alibi witnesses to testify in appellant's behalf; however, the decision to call a witness during the course of trial is generally a matter of trial strategy. State v. Sandy (1982), 6 Ohio App.3d 37; State v. Hunt
(1984), 20 Ohio App.3d 310; State v. Saah (1990), 67 Ohio App.3d 86; State v. Coulter (1992), 75 Ohio App.3d 219.
In this case, trial counsel filed a notice of alibi a few weeks prior to the commencement of trial. Appellant asserted he was "at home" during the time of the arson fire. The matter thereafter was not pursued.
The consistency of the testimony of the state's witnesses concerning appellant's presence that night at both the Maynard and Taylor homes suggests counsel subsequently determined the defense of alibi was not available. Instead, counsel focused on attacking the credibility of the co-defendants' designation of appellant as the instigator of the crimes. Defense counsel thus made the most of what little was available to him.
The record demonstrates defense counsel was capable, well-prepared and zealous in his defense of his client. Effective assistance of counsel does not guarantee favorable results. Statev. Hart (1988), 57 Ohio App.3d 4. At any event, in view of the overwhelming evidence of appellant's guilt, the record herein fails to show, with reasonable probability, that the jury's verdict would have been different had counsel called additional witnesses to testify appellant was with them at the time of the incident. State v. Seokaran and Pooran (Apr. 8, 1993), Cuyahoga App. Nos. 62298, 62299, 63353 and 63354, unreported. Thus, appellant cannot support his claim he was denied effective assistance of counsel at trial.
In view of this court's disposition of appellant's third assignment of error, another of appellant's assertions concerning counsel's actions must fail. Any challenge to appellant's sentences on the basis of R.C. 2941.25(A) would have been useless. Since trial counsel cannot be faulted for failure to make futile objections, counsel's assistance was not deficient in this matter. State v. Mitchell (1988), 53 Ohio App.3d 117; Statev. Gilbert (Sep. 27, 1994), Cuyahoga App. No. 66269, unreported.
Finally, appellant asserts counsel was deficient for his failure to challenge the improper sentence. A review of the record, however, reveals the confusion as to the degree of the crime of arson was general. At the commencement of trial, the trial court placed on the record the discussion of appellant's rejection of a plea agreement with the state. During the trial court's inquiries of appellant, the court asked the prosecutor to outline the degrees of the offenses. To the trial court's question, "The arson, what degree is that on count eleven * * *?" I the prosecutor responded, "That is a 2." This misconception by all of the parties persisted during appellant's sentencing.
Moreover, the trial court made abundantly clear its opinion that it considered the nature of appellant's crimes to be extremely serious; therefore, any challenge to the imposition of consecutive terms clearly would have been unsuccessful.
In view of defense counsel's otherwise competent representation, the overwhelming evidence of appellant's guilt and this court's ability to remand this case for correction of the sentencing errors, this court cannot find counsel's omission at the final moment of the proceedings either deprived appellant of substantial justice or had a prejudicial effect in this case.State v. Bradley, supra.
Accordingly, appellant's fifth assignment of error also is overruled.
Appellant's convictions are affirmed. Appellant's sentences are vacated. This case is remanded for a journal entry indicating the disposition of the charge against appellant of breaking and entering and for re-sentencing in accordance with this court's disposition of appellant's fourth assignment of error.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for re-sentencing and execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JUDGMENT: AFFIRMED; SENTENCE VACATED; REMANDED FOR RE-SENTENCING.
TERRENCE O'DONNELL. P.J. and JAMES D. SWEENEY. J. CONCUR. 5
 _______________________ KENNETH A. ROCCO, JUDGE
[1] Quotes indicate testimony given by a witness at appellant's trial.
[2] Michael Taylor also was indicted individually on separate charges of conspiracy.
[3] Each of the first ten counts alleged appellant, "by means of fire or explosion, knowingly created a substantial risk of serious physical harm" to a specific firefighter. The final count of aggravated arson concerned the building itself and alleged appellant had committed the offense "through the offer * * * of an agreement for hire * * *."
[4] When the prosecutor notified the trial court of this development, he also moved both to dismiss the charges of the indictment that named Michael Taylor as a defendant and to renumber the remaining counts of the indictment. In granting this request, the trial court apparently dismissed the count that charged appellant with breaking and entering since that charge was not included in the re-numbered counts. However, there is no notation in any journal entry to that effect.